# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| DURHAM SCHOOL SERVICES, L.P. ) | | |
| ) | No. 2:14-cv-00055-DCN | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| GENERAL DRIVERS, ) | | |
| WAREHOUSEMEN and HELPERS, ) | | |
| LOCAL UNION NO. 509, a/w ) | | |
| INTERNATIONAL BROTHERHOOD ) | **ORDER** | |
| OF TEAMSTERS, ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

This matter is before the court on cross motions for summary judgment. For the reasons set forth below, the court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment on liability.

## I.   BACKGROUND

Plaintiff Durham School Services, L.P. ("Durham") is a limited partnership engaged in providing bus transportation to students in Charleston County. Def.'s Mot. 1. Durham operates a fleet of over 350 school buses, including 250 state-owned buses and 126 Durham-owned buses. Id. at 5. Defendant General Drivers, Warehouse and Helpers, Local Union No. 509, is an unincorporated labor union affiliated with the International Brotherhood of Teamsters (the "Union") in West Columbia, South Carolina. Id. at 2. In 2007, the Charleston County School District contracted with Durham to provide transportation to public school students in Charleston County. Id. at 1. That year, Durham and the Union entered into a collective bargaining agreement effective from August 15, 2007 to August 15, 2012 (the "2007 CBA"). Def.'s Mot. Ex. 1.

1

The 2007 CBA defined bargaining unit employees as

> [A]ll fulltime and regular part time school bus drivers and aides employed by the Employer at or out of its . . . Charleston, South Carolina area facilities . . . exclud[ing] managers, operations supervisors, clerical, payroll, dispatch, safety coordinator, assistant managers, assist safety, routing supervisor, trainer examiner, mechanics, maintenance employees, and all other employees.

Id. at 2. Under Article 10 of the 2007 CBA, bargaining unit work is defined as "[a]ll bus driving work performed out of Durham's . . . Charleston County locations and all bus driving work performed for the Charleston County Public Schools . . . ." Id. at 9. Bargaining unit employees were paid a Driving Rate for bargaining unit work, which varied based on a driver's experience. Id. at 24. Article 24 of the 2007 CBA prohibits the subcontracting of bargaining unit work, stating that Durham may not "use any third party, leasing program, or any method to deprive its employees of the work that is currently being performed by the bargaining unit with the job classifications covered by this Agreement." Id. at 21. Section 2 of Article 14 allows bargaining unit employees to "have the option to bid a summer school route, charter runs, sub-driver, or any other summer work that may be needed." Id. at 13. Article 11 the 2007 CBA gives Durham the managerial authority to determine the "size of the workforce [and] the allocation and assignment of work." Id. at 10.

Between 2007 and 2012, some Union employees cleaned the inside of buses and repaired seats.[1] Def.'s Mot. 7–8. Under the 2007 CBA, Union employees were paid a "Non-Revenue Rate" of $11.00/hour when they conducted such work outside of their

---

[1] Under the 2007 CBA, Union employees were required to perform some minor cleaning of the buses after each shift, including emptying the trash, keeping the areas clean, and sweeping the floors. Def.'s Mot. 6. The Union employees were not required to perform deep interior cleaning of the buses. Thus, "bus cleaning" as discussed in this order refers to extensive interior cleaning of the buses beyond drivers' incidental cleaning duties.

2

standard work hours or during the summer. Id. at 7, 11. The parties dispute the number of Union employees who cleaned the interior of the buses and repaired seats and the number of hours spent performing such work. However, it is undisputed that prior to entering into the 2012 CBA, Durham used non-bargaining unit employees and some Union employees to perform various "Non-Revenue Rate" duties, including repairing bus seats and cleaning buses.

Union employees expressed dissatisfaction with the Non-Revenue Rate and wanted to be paid their normal Driving Rate for seat repair and bus cleaning work. In 2012, the parties renegotiated the 2007 CBA. Durham agreed to omit the Non-Revenue Rate entirely from the 2012 agreement. Id. at 12. Durham and the Union executed the 2012 CBA in March 2013, and the agreement is effective from August 2012 through August 2017 (the "2012 CBA"). Def.'s Mot. Ex. 2 at 22. The 2012 CBA is largely identical to the 2007 CBA except that the Non-Revenue Rate does not appear in the 2012 CBA. See Def.'s Mot. Ex. 1 at 24. Notably, the "bargaining unit" as defined in the 2012 CBA mirrors the definition of the bargaining unit in the 2007 CBA. Def.'s Mot. Ex. 1 at 2; Def.'s Mot. Ex. 2 at 2. The 2012 CBA gives Durham the same managerial authority to determine the size of the workforce and manage the allocation and assignment of work. Def.'s Mot. Ex. 2 at 12. Further, the 2012 CBA also contains Articles 10 and 24, which outline the scope of bargaining unit work and prohibit the subcontracting of work currently being performed by the bargaining unit as classified therein. Id. at 9, 20.

Once the 2012 CBA became effective, Durham ceased offering bus cleaning and seat repair job opportunities to Union employees. Def.'s Mot. 12. In May 2013, Durham hired a part-time maintenance worker to perform seat repairs. Id. at 13. Nic Geathers

("Geathers") is currently employed by Durham in a non-bargaining unit position to repair seats.  Id.  In July 2013, Durham hired Randstad Work Solutions ("Randstad") to provide temporary employees to clean the bus interiors in addition to Durham non-bargaining unit employees.  Id. at 14.

Beginning in June 2013, Local 509 Business Agent Sabrina Isom ("Isom") filed numerous grievances regarding both seat repair and bus cleaning work.  Isom alleged that Durham violated Articles 10 and 24 of the 2012 CBA by assigning seat repair and bus cleaning work to non-bargaining unit Durham employees and to Randstad.  The first grievance filed on June 18, 2013 stated:  "On behalf of all drivers to be made whole in every way.  Covering of seats is being continuously done by staff."  Def.'s Mot. Ex. 33 at 2.  Isom filed a second grievance with the same language on July 12, 2013.  That same day, Isom also filed a grievance involving bus cleaning that stated:  "On behalf of all drivers to be made whole in every way.  Cleaning of the school bus is being continuously done by staff."  Def.'s Mot. Ex. 35 at 12.  Isom filed a second grievance regarding bus cleaning on August 1, 2013 that stated "[t]emp service hired to clean buses."  Id. at 14.  Isom filed an additional grievance on August 12, 2013 which stated that "bargaining unit work is not being done by bargaining unit."  Def.'s Mot. Ex. 34 at 30.  Durham Regional Manager David Brabender ("Brabender") denied the grievances, stating that "[t]his work does not fall under Article 10."  Def.'s Mot. Ex. 33 at 3.

The 2007 and 2012 CBAs provide a grievance procedure by which the Union and Durham may resolve labor disputes.  Def.'s Mot. Ex. 2 at 4.  If the conflict is not resolved through the grievance process, the grievance may be submitted to the Piedmont Grievance Committee, a dispute resolution body.  Id.  If the Piedmont Grievance

Committee deadlocks, the parties may submit the dispute to an arbitrator selected from a panel provided by the Federal Mediation and Conciliation Service. Id.

The parties submitted the grievances to the Piedmont Grievance Committee. Def.'s Mot. 17. The Piedmont Grievance Committee deadlocked on two procedural issues. Id. at 19. Thus, the Piedmont Grievance Committee never addressed the merits of the Union's grievances. Although the 2012 CBA allows the parties to submit their grievances to binding arbitration, Durham and the Union agreed to postpone arbitration pending resolution of the present action. Id. at 20.

On January 7, 2014, Durham filed the present action pursuant to Section 303 of the Labor Management Relations Act of 1959 ("LMRA") alleging that the Union violated sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act ("NLRA"). Specifically, Durham alleges that the work sought by the Union in filing and continuing to prosecute the grievances is not bargaining unit work as defined under the 2012 CBA. Thus, Durham alleges that the Union's actions violated the NLRA because they sought to force Durham to cease doing business with other people. The Union filed a motion for summary judgment on July 22, 2014. Durham filed a response to the Union's motion for summary judgment on August 14, 2014, and filed its own motion for summary judgment on liability that same day. The Union responded to Durham's motion for summary judgment on September 5, 2014 and filed a reply on the same day. Durham filed a reply on September 15, 2014. The motions have been fully briefed and are now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### III.  DISCUSSION

Durham argues that, in filing the grievances, the Union pursued an interpretation of the 2012 CBA that would render it unlawful under section 8(e) of the NLRA because it would effectively force Durham to cease doing business with Geathers and Randstad. Durham further argues that the Union's objective in filing the grievances was to pressure Durham to cease doing business with Randstad and Geathers.  Thus, Durham argues that the Union's actions violated section 8(b)(4)(ii)(A) and (B).  The Union argues that their grievances were filed in an effort to preserve bargaining unit work traditionally performed by Union employees.  Def.'s Mot. 26.  Thus, the Union claims that its actions in pursuing the grievances did not violate section 8(b)(4)(ii)(A) or (B) under the work preservation exception because the work sought was "fairly claimable."[2]  Id.  Durham contends that the Union is not entitled to the work preservation defense because the Union sought to acquire new work and not preserve work traditionally performed by bargaining unit employees.

Originally known as the Wagner Act, the NLRA, 29 U.S.C. §§ 151–169, was enacted in 1935 to address the "inequality of bargaining power between employees . . . and employers," "encourage[] the practice and procedure of collective bargaining," and "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing."  NLRA § 1; 29 U.S.C. § 151. Congress's primary objective in enacting the NLRA was "[t]o achieve stability of labor

---

[2] The Union further argues that the court does not have jurisdiction to consider Durham's allegations that the Union violated section 8(e).  Def.'s Mot. 20.  Rather, the Union contends that the National Labor Relations Board ("NLRB") has exclusive jurisdiction to resolve Durham's allegations because section 8(e) does not provide a private cause of action.  Id.  It is clear that section 303(b) of the LMRA provides a private cause of action for violations of section 8(b)(4)(ii)(A), which makes it an unfair labor practice to force an employer to enter into an agreement that violates section 8(e).  See Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am., 147 F.3d 296 (4th Cir. 1998) (determining whether a national collective bargaining agreement violates section 8(e)).  Thus, the Union's jurisdictional argument is without merit.

relations." Colgate-Palmolive-Peet Co. v. NLRB, 338 U.S. 355, 362 (1949). In 1947, Congress passed the LMRA, or the Taft-Hartley Act, which extensively revised and supplemented the NLRA. Among other things, the Taft-Hartley Act added section 8(b), which prohibits unfair labor practices by unions. The NLRA is now a subchapter of the larger LMRA.

Section 303(a) of the LMRA provides that it "shall be unlawful . . . for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the [NLRA], as amended." 29 U.S.C. § 187(a). Section 303(b) of the LMRA provides a private cause of action for violations of section 8(b)(4), stating that "whoever shall be injured in his business or property by reasons of any violation of subsection (a) . . . shall recover damages by him sustained and the cost of the suit." 29 U.S.C. § 187(b).

Section 8 defines and prohibits "unfair labor practices" that infringe on section 7 rights. 29 U.S.C. § 158. Section 8 of the NLRA contains the following provisions that are pertinent to the court's analysis. Section 8(b)(4) provides that it shall be an unfair labor practice for a labor organization or its agent

> (ii) to threaten, coerce, or restrain any person . . . where [ ] an object thereof is—(A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by subsection (e) of this section; [or] (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . .

29 U.S.C. § 158(b)(4)(ii)(A) & (B). Acts that violate section 8(b)(4)(ii)(B) are commonly referred to as secondary boycotts. Section 8(e) provides:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement . . . whereby

8

> such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . .

Although section 8(e) does not provide a private cause of action, agreements that violate section 8(e) can be the subject of actions alleging violations of section 8(b)(4).

### A. Secondary Objective

Union actions which seek a secondary objective violate section 8(b)(4). Humphrey ex. rel. NLRB v. Int'l Longshoremen's Ass'n ("Longshoremen I"), 548 F.2d 494, 497 (4th Cir. 1997) ("[L]abor contracts which are designed to acquire for members of the union work which they have not previously performed are unlawful if they expressly or impliedly require the employer to cease doing business with another person."). "Secondary union activity includes disrupting business relations of a non-union employer or expanding the reach of the union to claim work not traditionally performed by bargaining unit members." Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, 997 F. Supp. 2d 1037, 1043 (D. Alaska 2014). On the other hand, acts that seek to preserve work traditionally performed by bargaining unit employees, rather than acquire new work, do not violate section 8(b)(4) because they are not considered coercive. Longshoremen I, 548 F.2d at 497 ("[U]nion action and collective bargaining agreements which are intended to preserve work traditionally done by members of the bargaining unit do not contravene Sections 8(b)(4)(ii)(B) and 8(e) of the Act . . . ."); Am. President Lines, 997 F. Supp. 2d at 1043 ("A union's actions will not be deemed coercive under section 8(b)(4) if the purpose of those actions are aimed at preserving work for its employees in the

9

bargaining unit (primary union activity), rather than accomplishing union goals elsewhere (secondary union activity).").

The test is whether the union action is "addressed to the labor relations of the contracting employer vis-à-vis his own employees." NLRB v. Int'l Longshoremen's Ass'n ("Longshoremen II"), 447 U.S. 490, 504 (1980) (quoting Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 644–45 (1967)). The Supreme Court has stated:

> Whether an agreement is a lawful work preservation agreement depends on 'whether, under all the surrounding circumstances, the Union's objective was preservation of work for [bargaining unit] employees, or whether the [agreement was] tactically calculated to satisfy union objectives elsewhere . . . . The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees.'

Longshoremen II, 447 U.S. at 504 (quoting Nat'l Woodwork, 386 U.S. at 644–45) (emphasis added).

If litigation has an illegal objective under federal law, a union's pursuit of litigation can constitute an unfair labor practice. See Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 747 (1983) ("[I]f [the] suit is withdrawn or is otherwise shown to be without merit, . . . the Board may then proceed to adjudicate the § 8(a)(1) and 8(a)(4) unfair labor practice case."). Courts have expanded this principle to extend to arbitration and the filing of grievances. See, e.g., Local Union No. 25, A/W Int'l Bd. of Teamsters v. NLRB., 68 F.3d 490, 495 (D.C. Cir. 1995) ("There is no logical reason to exclude arbitration from this principle."); Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705 v. NLRB, 820 F.2d 448, 449 (D.C. Cir. 1987) (reviewing a NLRB order finding that a union violated section 8(b)(4)(ii)(B) by filing a grievance); Local Union No. 25, Int'l Bd. of Teamsters v. NLRB, 831 F.2d 1149, 1154 (1st Cir.

1987) (applying Bill Johnson's analysis to the processing and filing of grievances). "A union's pursuance of a grievance through arbitration can be considered coercive under section 8(b)(4) if that grievance is based on an interpretation of a collective bargaining agreement that furthers an unlawful object." Am. President Lines, 997 F. Supp. 2d at 1043; see also Sheet Metal Workers, Local Union No. 91 v. NLRB, 905 F.2d 417, 424 (D.C. Cir. 1990) ("It is well established that the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4).").

Thus, it is clear that the Union's "pursuance of a grievance through arbitration can be considered coercive under section 8(b)(4) if that grievance is based on an interpretation of a collective bargaining agreement that furthers an unlawful object." Am. President Lines, 997 F. Supp. 2d at 1043; United Food & Commercial Workers Union Local No. 367, 333 N.L.R.B. 771, 781, 2001 WL 345201, at *16 (Apr. 4, 2001) ("The proscription [under section 8(4)(ii)(B)] has been held to include such pressure as the filing of a grievance or resort to arbitration, where the object of doing so is to coerce a cessation of business."). Durham argues that in filing the grievances, the Union pursued an interpretation of Article 10 that violates section 8(e) because the Union's interpretation would require Durham to cease doing business with Randstad and Geathers in violation of section 8(b)(4)(ii)(A). Durham further contends that the Union violated section 8(b)(4)(ii)(B) by filing grievances with the objective of forcing Durham to cease doing business with Geathers and Randstad.

The undisputed evidence shows that the Union's interpretation of the 2012 CBA would effectively require Durham to cease doing business with Randstad and Geathers.

11

If bus cleaning and seat repair were considered bargaining unit work under the 2012 CBA, Durham would be forced to offer Union employees <u>all</u> of the seat repair and bus cleaning work.  Thus, the Union's requested interpretation would necessarily result in an unlawful agreement in violation of section 8(e).  Further, by filing grievances, the Union specifically sought the work being performed by Geathers and Randstad.  The foreseeable result of pursuing the grievances was to pressure the neutral employer, Durham, and in turn, pressure Randstad and Geathers to cease doing business with Durham.  The fact that Durham did indeed cease doing business with Randstad after the Union members pursued the grievances makes the practical effect of the Union's actions more evident.  See <u>Associated Gen. Contractors of Cal., Inc. v. NLRB</u>, 514 F.2d 433, 437 (9th Cir. 1975) ("An attempt to cause a significant change in a secondary person's method of doing business constitutes a 'cease doing business' objective." (citing <u>NLRB v. Operating Eng'rs</u>, 400 U.S. 297 (1971))).  There is ample evidence of a "cease doing business" objective that brings this case squarely within the realm of section 8(b)(4).  Therefore, the Union violated the NLRA unless it can establish a valid work preservation defense.

   **B.  Work Preservation**

If the Union can prove that it sought to preserve work traditionally performed by bargaining unit employees rather than acquire new work, the Union will have an absolute defense.  The NLRB refers to this exception as the "work preservation exception."  As stated by the Supreme Court:

> [T]he inquiry must be carefully focused:  to determine whether an agreement seeks no more than to preserve the work of bargaining-unit members, the Board must focus on the work of the bargaining

>unit employees, not on the work of other employees who may be doing the same or similar work . . . .

Longshoremen II, 447 U.S. at 507.

In determining whether union action has a lawful work preservation objective or an unlawful secondary objective, the court applies a two-part test: (1) whether the union's objective seeks to preserve work traditionally performed by employees represented by the union; and (2) whether the contracting employer has the power and control to give the employees the work sought. Id. at 504–05. "The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work." Id. at 505. The court must make "an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for [union] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." NLRB v. Enter. Ass'n of Steam of N.Y. & Vicinity, Local Union No. 638, 429 U.S. 507, 535 (1977) (emphasis added).

First, the court looks to the scope of bargaining unit work as defined under the 2012 CBA to determine whether the Union had a valid work preservation objective. See Local No. 367, 333 N.L.R.B. at 776 n.9 ("[I]t is only bargaining unit work that may be preserved."). During the hearing on December 2, 2014, Plaintiff's counsel stated "I think you have to interpret the agreement to decide what is fairly claimable." Hr'g Tr. 26:25-27:1, Dec. 2, 2014. Similarly, defense counsel stated "[a]s far as interpreting the agreement, yes, you have to interpret the agreement . . . in determining whether it's fairly claimable." Hr'g Tr. 28:9-12. Under the 2012 CBA, "[a]ll bus driving work performed

13

out of Durham's Student's Charleston County locations and all bus <u>driving</u> work performed for the Charleston County Public Schools shall be considered bargaining unit work and shall fall under the scope of this Agreement." Def.'s Mot. Ex. 2 (emphasis added). Article 24 prohibits subcontracting of bargaining unit work and states that "[t]he company shall not use any third party, leasing program, or any method to deprive its employees of the work that is currently being performed by the bargaining unit with the job classifications covered by this Agreement." <u>Id.</u>

It is clear from the plain meaning of the unambiguous language of the 2012 CBA that seat repair and interior cleaning are not considered "bus driving work" as defined in the 2012 CBA. Although bargaining unit employees were permitted to bid on non-bargaining unit work, the work was never considered bargaining unit work nor treated as bargaining unit work, as evidenced by the fact that unit employees were paid the Non-Revenue Rate for performing such work. The Union provides no support for its contention that seat repair and interior bus cleaning became bargaining unit work once the bargaining unit performed it. <u>See</u> Def.'s Mot. 3. Further, even the Union representatives stated during the 2012 negotiations that bargaining unit work included only bus driving and monitoring the bus. L.D. Fletcher, the Union's president, stated "[y]ou need to have a contractor fix seats in the summer. We do not have this job description. The only jobs we have is monitoring the bus and driving the bus." Pl's Mot. Ex. 12 at 3-4. Therefore, the Union must have known that bus cleaning and seat repair did not fall within the scope of bargaining unit work as defined under the 2012 CBA.

The court also looks to the circumstances surrounding the negotiations of the 2012 CBA and the discussions between the parties during the negotiations as further

evidence that seat repair and bus cleaning are not considered bargaining unit work. "[C]ollective bargaining agreements may include implied as well as express terms." Bonnell/Tredegar Indus., Inc. v. NLRB, 46 F.3d 339, 344 (4th Cir. 1995) (quoting Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n, 491 U.S. 299, 311 (1989); Hill v. Norfolk & W. Ry. Co., 814 F.2d 1192, 1198 (7th Cir. 1987)). During to the 2012 negotiations, the Union expressed dissatisfaction with the Non-Revenue Rate paid to bargaining unit employees for "extra" work under the 2007 CBA, including seat repair and interior bus cleaning. The Union requested that Durham eliminate the Non-Revenue Rate from the 2012 CBA entirely. The notes from the negotiations reveal that Tom McBride, Durham's vice president, "explained it would be cheaper to go to an outside source" for jobs that do not include "monitoring the bus and driving the bus." Pl.'s Mot. Ex. 12, 3–4. The notes go on to include L.D. Fletcher's response to Tom McBride's statement: "go ahead and do it." Id.

Although the Union now disputes that its representatives intended to eliminate the work for which Union members were paid the Non-Revenue Rate, absent a scrivener's error, the notes indicate that the Union understood that Durham would contract out at least the seat repair work—if not all Non-Revenue work—and agreed to such arrangements under the 2012 CBA. The Union "cannot be allowed to attempt to 'preserve' work which it has specifically agreed to exclude from the definition of bargaining unit work." Local No. 367, 333 N.L.R.B at 782, 2001 WL 345201, at *18. Thus, bus cleaning and seat repair are not bargaining unit work as defined under the 2012 CBA.

Moreover, the work in question was not "traditionally" performed under the 2012 CBA and cannot support a valid work preservation defense. Article 24 of the 2012 CBA prohibits subcontracting of work "currently being performed by the bargaining unit with the job classifications cover by this Agreement." Pl.'s Mot. Ex. 2, 20. Since the inception of the 2012 CBA, bargaining unit employees have neither performed any seat repairs nor cleaned the interiors of any of the buses. Indeed, the Union conceded that Durham never gave bargaining unit employees seat repair or bus cleaning work once the 2012 CBA became effective. Def.'s Mot. 12. Therefore, this work was never "traditionally performed" under the 2012 CBA.

"[P]rior cases . . . suggest [that] work may be fairly claimable when employees do the work on a regular basis, if only a small percentage." Local 32B-32J, 68 F.3d at 494. Although it is undisputed that some Union employees were paid the Non-Revenue Rate under the 2007 CBA to repair some seats and clean some buses, the NLRB considers the proportion of the work performed by the bargaining unit. See In Re Newspaper & Mail Deliverers Union of N.Y. & Nyp Holdings, Inc., 337 N.L.R.B. 608, 617 (2002) ("[T]he record demonstrates that employees of the paper have not performed a substantial portion of the deliveries."). The vast majority of bargaining unit employees never performed the work at issue and the vast majority of bus cleaning and seat repair work was performed by Durham employees, even under the 2007 CBA. Therefore, Union employees never performed seat repair or bus cleaning work in a meaningful way. See id. (finding that the employees "had never meaningfully done the cleaning work," and that although the employees "ha[d] pitched in in emergency situations, . . . that hardly makes the work fairly claimable.").

Not only were seat repairs and interior bus cleaning not "traditionally performed" by bargaining unit employees under the 2012 CBA, but the work also does not require the same skills and abilities as work historically performed by Union employees to make the work "fairly claimable."  See Sheet Metal Workers, Local 141 (Cincinnati Sheet Metal & Roofing Co.), 174 N.L.R.B. 843, 851 (1969) (finding the work claimed by the union "to be neither unit work nor fairly claimable as unit work").  Under some circumstances, work that is not traditionally or customarily performed by union employees may still be fairly claimable if it requires the same skills and abilities as the traditional work of the unit employees.  See, e.g., Can. Dry Corp. v. NLRB, 421 F.2d 907, 909–10 (6th Cir. 1970) ("Although the tasks of initially handling and shelving the particular brand name products in issue had not been traditionally performed by the store clerks, we do not regard the clerks' claim to these jobs as representing in any realistic sense an attempt to monopolize jobs or acquire new job tasks.  Rather, these were the type of jobs which the clerks and [sic] traditionally done and for which they had the skills and experience."); Frito-Lay, Inc. v. Retail Clerks Union Local No. 7, 629 F.2d 653, 660 (10th Cir. 1980) ("Where the additional work requires the same skills and abilities as the traditional work of the unit employees, the new work has been viewed as 'fairly claimable', and the clauses by which such work is acquired have been upheld as primary work preservation agreements."); Sheet Metal Workers Local 223 v. NLRB, 498 F.2d 687, 669 (D.C. Cir. 1974) (finding that union employees had the skills to fabricate stucco stops and gravel stops because the work had been performed for other contractors in the past).

Work is fairly claimable if it is "identical to or very similar to that already performed by the bargaining unit and that bargaining unit members have the necessary

17

skill and are otherwise able to perform." Newspaper & Mail Deliverers (Hudson News), 298 N.L.R.B. 392, 399–400 (1993). See also Ohio Valley Coal Co. v. Pleasant Ridge Synfuels, LLC, 54 F. App'x 610, 617 (6th Cir. 2002) ("The work at issue needs to be either that which has been historically performed by union employees or that which is 'fairly claimable' by employees because it requires skills and abilities similar to those of the traditional work performed."); Frito-Lay, 629 F.2d at 660 ("Where the additional work requires the same skills and abilities as the traditional work of the unit employees, the new work has been viewed as 'fairly claimable', and the clauses by which such work is acquired have been upheld as primary work preservation agreements."). Seat repair and interior bus cleaning do not require the same skills and abilities as "bus driving" work, nor are they the same "type" of work. Although the court does not doubt that some Union employees have the ability to perform the interior cleaning of the buses and repair bus seats, it is apparent that such work is not fairly claimable under the test outlined above.

It is evident from the language of the grievances that, even if the court were to find that the few Union employees who actually performed the work in question "traditionally performed" bus cleaning and seat repair work, the Union sought work outside the scope of the work performed. Although the Union stated that it only "seeks to retain two summer seat repair jobs and two or three summer bus cleaning jobs," the language of the grievances was not so limited. Def.'s Mot. 19. The first grievance filed on June 18, 2013 stated "[o]n behalf of all drivers to be made whole in every way. Covering of seats is being continuously done by staff." Pl.'s Resp. Ex. 34, 2 (emphasis added). The Union filed a second grievance on July 12, 2013, with the same language.

The same day, the Union also filed a grievance involving bus cleaning that stated "[o]n behalf of all drivers to be made whole in every way. Cleaning of the school bus is being continuously done by staff." Pl.'s Resp. Ex. 36, 12 (emphasis added). The Union filed a second grievance regarding bus cleaning on August 1, 2013 that stated "[t]emp service hired to clean buses." Pl.'s Resp. Ex. 36, 14.

Although it is undisputed that some bargaining unit employees repaired some seats and cleaned some buses during the life of the 2007 CBA, the broad language of the grievances plainly sought more than the work actually performed by those few bargaining unit employees. Thus, it is clear that in filing the grievances, the Union sought to acquire work being performed solely by Ranstad and Geathers in an attempt to force Durham to cease doing business with Ranstad and Geathers. The foreseeable result of the Union's actions was to pressure Durham, a neutral employer, to pressure Ranstad to terminate its business relationship with Durham, a result that did in fact occur. Thus, the Union violated section 8(b)(4)(ii)(A) by filing grievances in pursuit of an interpretation of the 2012 CBA that would render Article 24 unlawful under section 8(e). Further, in seeking to coerce Ranstad and Geathers to cease doing business with Durham, the union violated section 8(b)(4)(ii)(B).

For the aforementioned reasons, the court finds that the Union failed to establish a valid work preservation defense because the work sought neither was traditionally performed by Union employees nor required the same skills and abilities as work historically performed by bargaining unit employees.[3] Therefore, the court finds that the

---

[3] In light of the court's finding that the Union does not have a valid work preservation defense, it is unnecessary to address whether Durham had the right to control the work in question. See Local 32B-32J, 68 F.3d at 495 ("Since the Local fails to meet the threshold condition of showing that the work is fairly claimable, [the employer's] right to control is irrelevant.") (internal quotation marks omitted).

Union violated sections 8(b)(4)(ii)(A) and (B) in filing the grievances with the object of pressuring Durham to cease doing business with Randstad and Geathers and in pursuit of an interpretation of the 2012 CBA that would render it unlawful under section 8(e).

### IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** plaintiff's motion for summary judgment on liability and **DENIES** defendant's motion for summary judgment. **AND IT IS SO ORDERED**.

                                             **DAVID C. NORTON**
                                             **UNITED STATES DISTRICT JUDGE**

**February 5, 2015**
**Charleston, South Carolina**